UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DENISE ARRUDA,                          )
                                        )
                Plaintiff,              )    CIVIL ACTION NO.
                                        )    17-10105-DPW
v.                                      )
                                        )
ZURICH AMERICAN INSURANCE               )
COMPANY,                                )
                                        )
                Defendant.              )


MEMORANDUM AND ORDER
February 6, 2019

Denise Arruda brings this action against Zurich American Insurance Company ("Zurich") seeking accidental death benefits pursuant to an employee welfare benefits plan stemming from the death of her husband, Joseph Arruda, in a car accident. Zurich has denied benefits. The parties have separately filed motions for judgment on the administrative record. The parties do not contest the language or meaning of the contract terms, but instead contest the sufficiency of the record evidence to support Zurich's decision. Finding that Zurich's decision is not supported by substantial evidence, I will grant Mrs. Arruda's motion and deny that of Zurich.

## I. BACKGROUND

### A.   *Factual Background*

#### 1.   Mr. Arruda's General Health

Mr. Arruda, age 57, worked as a salesperson for NSTAR in

May of 2014.  [Administrative Record ("R.") at 3.]  He had been suffering from hypertension, hyperaldosteronism, and hypertrophic cardiomyopathy.  Mr. Arruda was obese, did not exercise, and did not follow-up with physicians as instructed. [*Id.* at 333, 335-36.]  He also failed to follow his prescription medication regimen.  [*Id.*]

In January 2014, Mr. Arruda passed out at home and was admitted to the hospital the following day.  [*Id.* at 151.]  As a result of that medical episode, he had a ardioverter/defibrillator pacing device surgically implanted in the left side of his chest in January 2014.  [*Id.* at 334.]  Mr. Arruda's last medical examination by his cardiologist, Christopher Abadi, M.D., on February 25, 2014, included notes that Mr. Arruda had "done well from a cardiac standpoint since" having the defibrillator implanted and that his "blood pressure was fine."  [*Id.* at 195.]

    2.    The Policy

Mr. Arruda was insured under Basic Accident Policy No. GTU 4380194 (the "Policy") issued by Zurich.  [*Id.* at 473.]  The Policy provides, in relevant part that: "If an **Insured** suffers a loss of life as a result of a **Covered Injury**, **We** will pay the applicable **Principal Sum**."  [*Id.* at 96.]  It defines a covered injury as "an **Injury** directly caused by accidental means which is independent of all other causes, results from a **Covered**

2

**Accident**, occurs while the Covered Person is insured under this Policy, and results in a **Covered Loss**." [*Id.* at 92.] A covered accident is defined as "an **Accident** that results in a **Covered Loss**." [*Id.*] An accident is "a sudden, unexpected, specific, and abrupt event that occurs by chance at an identifiable time and place during the **Policy** term." [*Id.*] Finally, a covered loss is "a loss which meets the requisites of one or more benefits or additional benefits, results from a **Covered Injury**, and for which benefits are payable under this Policy." [*Id.*] The Policy also contains two relevant exclusions: Exclusion 4, which provides that a "loss will not be a **Covered Loss** if it is caused by, contributed to, or results from . . . illness or disease, regardless of how contracted . . ." and Exclusion 8, which provides that a loss will not be a covered loss if it is caused by, contributed to, or results from "being under the influence of any prescription drug, narcotic, or hallucinogen." [*Id.* at 102.]

### 3. The Car Accident

On the morning of May 22, 2014, Mr. Arruda was driving to the University of Massachusetts-Amherst to attend a work event. [*Id.* at 1.] At about 9:39 a.m., Mr. Arruda's car crossed the highway median into oncoming traffic and struck another car. [*Id.* at 147, 471.] The collision caused Mr. Arruda's car to hit a curb, flip over multiple times, and land upright. [*Id.* at

3

143.] CPR was performed on Mr. Arruda. [*Id.* at 147.] He was pronounced dead on the scene by the Hadley Fire Department. [*Id.*] The autopsy report listed Mr. Arruda's cause of death as hypertensive heart disease. [*Id.* at 834.] A postmortem toxicology report found that Mr. Arruda had marijuana in his system at the time of the crash. [*Id.* at 842.]

### 4.    The Attempt to Collect

On or about August 19, 2014, Mrs. Arruda filed for accidental death benefits, as beneficiary of the Policy. [*Id.* at 52.] Zurich then retained the services of an investigator, CS Claims Group, Inc. ("CS Claims"), to investigate the loss. [*Id.* at 109.] CS Claims investigated over a period of eight months, providing Zurich with 17 reports regarding its progress in collecting medical records, witness statements, and medical examiner reports. [*Id.* at 125, 128, 132, 135, 189, 269, 331, 399, 400-402, 801, 802, 804, 831-33, 852.]

In a letter dated December 8, 2015, Zurich issued a denial of benefits based on two grounds. [*Id.* at 473.] First, Zurich concluded that Mr. Arruda's death was not the result of an accidental bodily injury independent of all other causes. [*Id.* at 475.] Second, and independently, Zurich concluded that the Policy exclusion for loss caused by, contributed to, or resulting from illness or disease, was applicable. [*Id.*] Essentially, Zurich concluded that Mr. Arruda's cause of death

4

was hypertensive heart disease such that Mr. Arruda's death was not independent of an underlying medical condition.  [*Id.* at 474.]

On January 29, 2016, Mrs. Arruda filed an appeal of denial with Zurich.  [*Id.* at 477.]  In this appeal, Mrs. Arruda submitted an Arrhythmia Logbook report from Boston Scientific, the manufacturer of Mr. Arruda's implantable cardioverter defibrillator; the hearing transcript from Mr. Arruda's July 1, 2015 workers' compensation hearing; and the workers' compensation lump sum settlement agreement.  [*Id.* at 477.]  Mrs. Arruda supplemented her appeal on August 24, 2016 with an expert report from Elizabeth A. Laposta, M.D.  [*Id.* at 1407-1424.]

The appeals committee included four individuals who reviewed the matter de novo.  [*Id.* at 1786.]  In assessing Mrs. Arruda's claim, the appeals committee retained a medical opinion from forensic pathologist Mark Taff, M.D.  [*Id.* at 1526.]  Zurich submitted a letter to Mrs. Arruda dated February 7, 2017, documenting Dr. Taff's opinion as to Mr. Arruda's cause of death.  [*Id.* at 1584.]  In sum, Dr. Taff concluded that Mr. Arruda died as a result of accidental bodily injuries that were contributed to by multiple pre-existing illnesses or diseases, which caused him to lose control of his car and crash.  [*Id.* at 1599-1600.]  Within the February 7 letter, Zurich notified Mrs. Arruda that it might raise Exclusion 8 (contribution of drug

use) of the Policy with regard to her claim.  [*Id.* at 1584.]
Zurich explained that before it issued its final decision, it
would give Mrs. Arruda an additional 30 days to review the
material and provide any input regarding the Exclusion 8
language.  [*Id.*]  On April 17, 2017, Mrs. Arruda submitted Dr.
Laposata's response to Dr. Taff's report for Zurich's review,
which included a direct response to Zurich's application of
Exclusion 8.  [*Id.* at 1697-1700.]

By letter dated May 11, 2017, Zurich's appeals panel
affirmed the initial denial, concluding that Mr. Arruda did not
sustain a covered loss due to a covered accident, and that the
claim was also excluded based on Exclusions 4 and 8.  [*Id.* at
1727.]  In that letter, Zurich explained that the evidence
indicated Mr. Arruda's death was caused by, or resulted from,
illness, disease, and use of marijuana.  [*Id.* at 1728.]
Zurich's letter also included explanations of the three medical
reviews it relied on, noting that William W. Angell, M.D., and
Michael D. Bell, M.D., both pointed to heart issues as the
primary cause of death, and that Dr. Taff concluded that Mr.
Arruda's health conditions were not the immediate cause of his
death, but "most likely triggered loss of control/erratic
driving . . . which resulted in fatal bodily injuries."  [*Id.*]

According the terms of the Policy, Zurich is the
administrator of the Plan, and it has discretion to apply and

interpret the terms of the Plan in determining claims for

benefits.  [*Id.* at 105.]  Specifically, the Plan provides:

> **ERISA Claims Fiduciary.**  The **Policyholder** agrees that
> the Policy constitutes the plan and plan document
> under the Employee Retirement Income Security Act of
> 1974 as amended (ERISA).  The **Policyholder** designates
> **Us** as the claims fiduciary of this plan and gives **Us**
> the discretionary authority to determine eligibility
> for benefits and to construe the terms of the plan.
> The Policyholder agrees to comply with the disclosures
> and reporting requirements of ERISA regarding the plan
> and **Our** designation and authority as the claims
> fiduciary.

[*Id.*]  "We" as defined in the Policy is Zurich.  [*Id.* at

93.]

In addition to these proceedings, a dispute regarding the

cause of Mr. Arruda's death gave rise to a workers' compensation

hearing on July 1, 2015.  [R. at 1290-97.]  After the hearing,

the parties reached a lump sum settlement of Mr. Arruda's

workers' compensation claim.  [*Id.* at 1391-92.]

### 5.   The Record Evidence

#### a.   *Dr. Bell*

Dr. Bell submitted a report to Zurich on November 30, 2015.

[*Id.* at 470.]  That report, based on a compilation of medical

and non-medical records provided for review, which included

progress notes from Mr. Arruda's cardiologist through February

2014, concluded that the crash and Mr. Arruda's death "were

caused by his heart disease, whether it be due to hypertension

or a variant of HCM."  [*Id.* at 470-71.]  Dr. Bell relied not

simply on Mr. Arruda's previous medical records, but also on the autopsy performed by Dr. Sexton, which showed that Mr. Arruda had "a C1 left posterior arch fracture and C3-C4 dislocation with soft tissue hemorrhage at the injury sites." [*Id.* at 471.] Dr. Bell found that this fracture was a contributory cause of death. [*Id.*] Dr. Bell also took into account Trooper David Sanford's collision analysis, Trooper McMillan's report, and Dr. Mindy Hull's cardiac pathology report. [*Id.*]

> b.   *Dr. Angell*

Dr. Angell submitted a medical opinion to Zurich, dated July 6, 2015. [Dkt. 38 at 12.] That report, consisting of just two paragraphs, notes that Mr. Arruda "experienced a cardiac event at the time of the accident which resulted in his death and that the death was not independent of an underlying medical condition as indicated in the autopsy report." [R. at 463.] Dr. Angell noted that his opinion was based on "a review of the file documents submitted which included medical records, police reports and Medical Examiner reports." [*Id.*]

> c.   *Dr. Sexton's Autopsy Report*

On May 23, 2014, the day after Mr. Arruda's fatal car accident, Andrew Sexton, D.O., performed an autopsy. [*Id.* at 834.] He finalized his report on June 22, 2014. [*Id.* at 840.] Based on that autopsy, Dr. Sexton concluded that Mr. Arruda's cause of death was hypertensive heart disease, with upper

cervical spine fracture due to blunt impact classified as a contributory factor. [*Id.* at 834] With regard to Mr. Arruda's heart, Dr. Sexton made note of the fact that it was "enlarged." [*Id.* at 838.]

Dr. Sexton's report was based solely on an examination of Mr. Arruda, and did not include any examination of his defibrillator device. [R. at 836.] Dr. Sexton noted that he was submitting the device to the Boston Office of the Chief Medical Examiner Office, where it would be submitted to Boston Scientific for analysis. [*Id.*] Dr. Sexton's report also notes that Dr. Hull would be providing a supplemental Cardiac Pathology Consultation Report. [*Id.* at 838.]

> d.  *Massachusetts State Police Report*

In a report dated August 25, 2014, Trooper William McMillan wrote a report concerning the Mr. Arruda's car accident. [*Id.* at 855.] The report notes that in investigating the car accident, Trooper McMillan concluded that Mr. Arruda had "experienced some type of medical episode while driving" and that "Mr. Arruda was pronounced at the scene and at fault for the crash." [*Id.*] Trooper McMillan's investigation involved interviewing witnesses and talking to Dr. Sexton. He notes that "Dr. Sexton opined that at the time of the crash, the defibrillator was working and did not show signs of activation due to a medical event." [*Id.* at 859.] Trooper McMillan also

noted that a witness to the event ran to Mr. Arruda's car and saw him "breathing heavily" with an "obvious neck injury." [*Id.* at 860.] She reported that Mr. Arruda "went into breathing distress and started to seize." [*Id.*]

e.  *EMS Report*

The Amherst Fire Department EMS Report notes that Mr. Arruda's vehicle crossed the center lane into oncoming traffic, striking another vehicle. [*Id.* at 147.] The police on scene found Mr. Arruda pulseless, and after CPR was initiated, and after an AED was connected, they "received multiple no shock advised" messages. According to the "narrative" and "impressions" sections of the report, Mr. Arruda suffered cardiac arrest. [*Id.*] The "impressions" section notes indicates cardiac arrest was "primary" and motor vehicle accident and trauma were "secondary." [*Id.*]

f.  *Dr. Taff*

Mark L. Taff, M.D., a forensic pathologist, reviewed the following evidence in writing up a report: (1) the Massachusetts Police Investigative/Motor Vehicle Crash reports; (2) Joseph Arruda's autopsy, toxicology, histology, cardiac pathology and death certificate reports; (3) medical expert reports prepared by Drs. Elizabeth Laposata, Michael Bell and William Angell; (4) pre-mortem medical records of Joseph Arruda dated 2004-2014; (5) news clips regarding the fatal motor vehicle collision; and (6)

testimonial transcripts of multiple witnesses. [*Id.* at 1526.]
Based on this 450-page file, Dr. Taff drew up answers to various
questions posed by Zurich. [*Id.*] He concluded that Mr.
Arruda's accident was caused by "several possible pre-existing
illnesses or diseases, singly or in combination, including . . .
cardiac arrhythmia," and a host of other possible issues. [*Id.*
at 1532.] Dr. Taff also concluded that Mr. Arruda "died from
accidental bodily injuries." [*Id.*] Furthermore, Dr. Taff found
that Mr. Arruda's "multiple pre-existing illnesses or diseases .
. . caused him to lose control of his car." [*Id.* at 1532-33.]

Dr. Taff also concluded that "the presence of marijuana in
JA's blood alone would have impaired his ability to operate his
motor vehicle by causing mental confusion, changes in pulse,
respiratory rate and blood pressure, heart palpitations,
agitation and possibly hallucinations." [*Id.* at 1532.]

g.   *Dr. Laposata*

Elizabeth A. Laposata, M.D., a former Chief Medical
Examiner for the state of Rhode Island and a former Assistant
Medical Examiner for Delaware, Philadelphia, and St. Louis
authored two reports regarding Mr. Arruda's car accident. [*Id.*
at 1412-13.] First, Dr. Laposata authored an initial report,
dated August 5, 2016, in which she assessed the autopsy
findings, medical records, and accident reports. [*Id.* at 1408-
1411.] Dr. Laposata concluded that "the cause of Mr. Arruda's

death resulted from the injuries sustained in the auto accident, namely, injuries to the neck and chest due to blunt force trauma." [*Id.* at 1409.] She also concluded "that Mr. Arura [sic] did not die from hypertensive heart disease or experience a so-called natural death at the wheel with a resulting collision." [*Id.*] This conclusion was based on Mr. Arruda's cardiac defibrillator, which did not show any abnormal heart rhythms before the accident; the autopsy, which did not show evidence of heart attack; and the evidence that Mr. Arruda's heart was still pumping after the crash occurred. [*Id.* at 1409-1410.] Accordingly, Dr. Laposata found that Dr. Sexton's assessment of cause of death was incorrect. [*Id.* at 1410.] Although she could not explain what caused Mr. Arruda to travel across traffic lanes and hit another vehicle, she found "no evidence that he experienced incapacitation by heart disease." [*Id.* at 1411.]

Dr. Laposata authored an addendum report in April 2017, which was a response to Zurich's interpretation of Dr. Taff's report. [*Id.* at 1699-1700.] In the addendum report, Dr. Laposata contends that there is "no medical or scientific evidence to support a conclusion that Mr. Arruda's death due to injuries sustained in that motor vehicle accident was 'caused by contributed to, or results [*sic*] from illness of [sic] disease.'" [*Id.* at 1699.] Dr. Laposata's addendum report also

contends that Zurich misrepresented Dr. Taff's findings and that Mr. Arruda's death was an accident, independent of all other causes. [*Id.*]

In addition, Dr. Laposata's report responds to the portion of Dr. Taff's report regarding the active metabolite of marijuana in Mr. Arruda's blood. [*Id.* at 1700.] Specifically, Dr. Laposata concludes that "the presence of an active metabolite of marijuana in Mr. Arruda's blood cannot be equated with proof that it influenced Mr. Arruda's ability to safely operate a motor vehicle." [*Id.*] That is because "blood levels of marijuana are not a reliable indicator of drug level in the target tissue which is the brain." [*Id.*] Accordingly, Dr. Laposata found that Mr. Arruda died from his injuries, independent of all other causes, and that the accident was neither caused nor contributed to by Mr. Arruda's pre-existing medical conditions or the presence of marijuana metabolites in his blood. [*Id.*]

### h.  *Boston Scientific Arrhythmia Logbook Report*

The arrhythmia logbook report, which makes note of "events" based on Mr. Arruda's cardiac activity, as measured by the internal defibrillator he had implanted in January 2014, shows that there were no measured "events" after May 20, 2014. [*Id.* at 1144.] The logbook report also shows that the last

successful completion of "rhythm ID update" was on May 22, 2014, at 8:23 a.m.  [*Id.* at 1147.]

### i.   *Dr. Hull*

Dr. Hull completed a cardiac pathology report, after conducting a cardiac exam on October 20, 2014, for Mr. Arruda. [*Id.* at 806.]  The report notes, among other things, that Mr. Arruda had mild coronary artery disease and "focal interstitial fibrosis of lateral left ventricle." [*Id.*]  It does not say that there is evidence of heart attack.  [*Id.* at 806-808.]

### j.   *Trooper Sanford's Reconstruction Report*

Trooper David C. Sanford conducted a reconstruction of the collision as part of the Massachusetts State Police investigation.  [*Id.* at 812.]  Trooper Sanford's report notes that Mr. Arruda was dead at the scene of the collision, and that Dr. Sexton listed his cause of death as "hypertensive heart disease." [*Id.* at 826.]  Trooper Sanford's opinion, based on what was known to him, was that Mr. Arruda "had suffered a catastrophic medical event which caused him to be unable to control his vehicle." [*Id.* at 829.]

### k.   *Officer Isakson's Testimony*

Officer David F. Isakson, who was the primary investigating officer, testified about the accident on July 1, 2015, during a workers' compensation hearing.  [*Id.* at 1364-74.]  He testified that he did not know what caused the accident.  [*Id.* at 1374.]

*l.    Postmortem Toxicology Report*

The Massachusetts State Police Department's Toxicology Lab analyzed samples of Mr. Arruda's blood, vitreous eye fluid, urine, bile, liver, and gastric content.  [*Id.* at 842.]  The toxicology report shows the presence of THC, the chemical compound in cannabis, and its inactive metabolite in Mr. Arruda's blood.  [*Id.*]

**B.    *Procedural Background***

Mrs. Arruda brought this action against Zurich and The NSTAR Electric and Gas Basic Accident Insurance Plan ("Plan") on January 23, 2017, claiming that she was wrongfully denied accidental death benefits.  On June 21, 2017, Mrs. Arruda and NSTAR filed a joint motion to dismiss the Plan as a party, which I granted on June 22, 2017.  On May 14, 2018, the parties filed respective motions for judgment on the administrative record, upon which I held a full hearing.

## II. STANDARD OF REVIEW

In an Employee Retirement Income Security Act ("ERISA") benefits case, a decision made by a plan administrator who has discretion "to determine eligibility for benefits or to construe the terms of the plan" is subject to an abuse of discretion, or arbitrary and capricious, standard of review.  *Firestone Tire & Rubber Co.* v. *Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); *O'Shea through O'Shea* v. *UPS Ret. Plan*, 837

F.3d 67, 73 (1st Cir. 2016).  In order to decide that a plan

administrator's decision was not "arbitrary, capricious, or an

abuse of discretion," I must find that the plan administrator's

decision was "plausible" and "supported by substantial evidence

on the record."  *O'Shea* at 73.  That is I must find that there

is "evidence reasonably sufficient to support [the

administrator's] conclusion" even if there is "contradictory

evidence."[1]  *McGillivray* v. *Life Ins. Co. of N. Am.*, 519 F. Supp.

2d 157, 160 (D. Mass. 2007).  But I also recognize that "the

---

[1]  Mrs. Arruda encourages me to adopt a burden-shifting approach
with respect to any contention from Zurich that is based on an
exclusion that could defeat coverage.  However, not only has the
First Circuit explicitly declined to reach the question of
whether to adopt that approach, *see Dutkewych* v. *Standard Ins.
Co.*, 781 F.3d 623, 634, n.7 (1st Cir. 2015) (citing *Gent* v. *CUNA
Mut. Ins. Soc'y*, 611 F.3d 79, 83 (1st Cir. 2010)), but it has
also made clear that, at least when the burden of proof is a
preponderance of the evidence, "how the burden is allocated does
not much matter unless one or both parties fail to produce
evidence, or the evidence presented by the two sides is in
'perfect equipoise.'"  *Gent*, 611 F.3d at 83 (quoting *LPP Mortg.,
Ltd.* v. *Sugarman*, 565 F.3d 28, 33 (1st Cir. 2009)).  That seems
equally applicable here, where my review of the record is
deferential.  That is, I see no reason to determine whether to
adopt any kind of burden-shifting approach, and, in fact, I am
inclined to think that no burden-shifting approach should apply
when the issue is only whether there is substantial evidence in
the record to support the administrator's determination.  I find
it difficult to reconcile the idea of putting the burden of
proof on one party while also applying an abuse of discretion
standard to that party's administrative determination.
Moreover, though Mrs. Arruda contends that Zurich's reasons for
denying coverage "are exclusions under the Plan," in reality,
Zurich justified its decision both based on Exclusions 4 and 8
and on the fact that Mr. Arruda did not sustain a covered loss.
[R. at 1727.]

administrator cannot simply ignore contrary evidence, or engage with only that evidence which supports his conclusion." *Petrone v. Long Term Disability Income Plan*, 935 F. Supp. 2d 278, 293 (D. Mass. 2013). Overall, I must keep in mind that I am "not to substitute [my] judgment for that of the decision-maker." *Pelletier* v. *Reliance Standard Life Ins. Co.*, 223 F. Supp. 2d 298, 303 (D. Me. 2002) (quoting *Terry* v. *Bayer Corp.*, 145 F.3d 28, 40 (1st Cir. 1998)) (internal quotation marks omitted).

### III. ANALYSIS

### A. *Illness or Disease: Independent of All Other Causes and Exclusion 4[2]*

Zurich first contends that the record contains substantial evidence to support a conclusion that Mr. Arruda's death did not result from a covered injury or covered loss. Specifically, Zurich argues that there is extensive record evidence to support the conclusion that Mr. Arruda died from a pre-existing medical condition. In support of this, Zurich points to the following evidence: (1) the two initial independent medical reviews from

---

[2] Though technically two separate provisions, the affirmative portion of the policy that requires the loss be independent of all other causes and Exclusion 4 require similar, if not identical, analysis. (Exclusion 4 limits recovery from a loss if the loss was caused by, contributed to, or resulted from illness or disease.) This is also true with respect to Exclusion 8, discussed below. To avoid redundancy, I discuss all arguments regarding Mr. Arruda's heart disease in this subsection, and I do the same thing with respect to the marijuana found in Mr. Arruda's system in the following subsection.

Dr. Bell and Dr. Angell; (2) the autopsy report from the Office of the Chief Medical Examiner of the Commonwealth of Massachusetts, written by Dr. Sexton; (3) the Massachusetts State Police report based on the investigation of the crash; (4) the "EMS Report" authored by two members of the Amherst Fire Department after the crash; and (5) a third independent medical review conducted by Dr. Taff.

Mrs. Arruda does not contest the fact that evidence of a pre-existing heart condition exists, but instead points to evidence in the record that contradicts Zurich's conclusion. She argues that the evidence Zurich relied on was incomplete or incorrect. She relies on the reports from Dr. Laposata, the arrhythmia logbook report from Boston Scientific, the manufacturer of Mr. Arruda's implantable cardioverter defibrillator, and Dr. Hull's report in support of her arguments. On their face, the arguments from the parties appear to amount to a battle of the experts. But probing more deeply, it is apparent that what is at issue is whether there is adequate evidence to support Zurich's contention regarding causation.

Zurich gives two separate explanations for why Mr. Arruda did not die from a covered injury. The first is that the cause of death was heart disease, as supported by the autopsy report, the EMS report, Dr. Angell's opinion, and Dr. Bell's opinion.

The autopsy report concluded that the cause of death was hypertensive heart disease, with a contributory factor of upper cervical spine fracture due to blunt impact. Dr. Bell wrote in his medical opinion that "[t]he crash and death were caused by his heart disease, whether it be due to hypertension or a variant of HCM [hypertrophic cardiomyopathy]." Dr. Bell further noted that a "C1 left posterior arch fracture and C3-C4 dislocation with soft tissue hemorrhage at the injury sites would be a contributory cause of death." Dr. Angell concluded that "Mr. Arruda experienced a cardiac event at the time of the accident which resulted in his death." Finally, the EMS report noted that the primary cause of death was cardiac arrest, and the secondary one was "motor vehicle accident."

Dr. Taff gave an alternative explanation. Unlike Dr. Bell, Dr. Taff stated that the cause of Mr. Arruda's death was "accidental bodily injuries" as he "sustained multiple blunt force impact injuries." Dr. Taff nevertheless concluded that Mr. Arruda died from heart disease because his "multiple pre-existing illnesses or diseases" caused him to lose control of his car and crash into another vehicle." State Trooper McMillan also concluded in his report that Mr. Arruda "experienced some type of medical episode while driving his vehicle … causing a two (2) car crash."

Mrs. Arruda observes the entire body of evidence cited by Zurich in support of its decision "establishes only that Mr. Arruda had been diagnosed and treated for a cardiac condition prior to his death, but not that he died from it." More specifically, Mrs. Arruda notes that after Mr. Arruda's January 2014 medical episode, and after he had the internal defibrillator implanted, he reported no palpitations. Mrs. Arruda also notes that the autopsy report did not take into account the arrhythmia logbook report from Mr. Arruda's defibrillator.[3] Mrs. Arruda additionally contends that Zurich failed to reconcile Dr. Taff's internal contradiction, claiming that his "honest assessment that it is impossible to know what caused the crash" is in tension with — indeed wholly undermines — his conclusion that Mr. Arruda's pre-existing illnesses, singly or in combination, caused the car accident.

---

[3] Mrs. Arruda also draws my attention to an apparent discrepancy in the dates of the various components of the autopsy report. Apparently Dr. Sexton finalized his report on June 12, 2014, but the toxicology and cardiac pathology reports were not signed until July 30, 2014 and January 12, 2015, respectively. [Dkt. 45 at 4.] Because Dr. Taff noted this discrepancy, Mrs. Arruda contends that Zurich failed to "reconcile[] its reliance upon the autopsy report with Dr. Taff's findings." I see no reason to read much into this discrepancy as such. Dr. Sexton may have failed to revise the date on his report. He also may have failed to consider Dr. Hull's final opinion. Or perhaps Dr. Hull gave Dr. Sexton a preliminary report that she later changed. In any event, I consider Dr. Hull's own ultimate assessment in making my determination and note only that Zurich did not engage with this discrepancy.

Mrs. Arruda affirmatively relies on the arrhythmia logbook report from Boston Scientific, which did not record any cardiac event at or near the time of the car accident. In this connection, she contends that Dr. Hull's pathological examination of Mr. Arruda's heart supports the arrhythmia logbook records, because Dr. Hull did not find evidence of clots or occlusions that would signal a heart attack. She argues that Mr. Arruda's workers' compensation claim and the settlement that was eventually reached, is evidence that Mr. Arruda's death was caused by an accident, and not his heart disease. Ultimately, Mrs. Arruda finally relies on Dr. Laposata's reports, and her conclusion that the death was accidental, period.

I find several pieces of evidence variously cited by the parties insubstantial at best. First, Zurich relies on Trooper Sanford's conclusory determination that Mr. Arruda suffered a catastrophic medical event. The record does not indicate Trooper Sanford has meaningful medical training in this area; consequently, his conclusory causation assessment is entitled to no weight. Zurich also relies on the EMS report issued by the Amherst Fire Department and Trooper McMillan's report concluding that "a medical episode" suffered by Mr. Arruda caused the crash. Again, because no evidence suggests that Trooper McMillan or the authors of the EMS report have expertise in this area of medicine, I find they do not have an adequate basis to

draw such a conclusion.  In short, the two conclusory reports
are entitled to no weight.  I similarly disregard Officer
Isakson's causation statement.  Finally, I find Dr. Angell's
report unreliable.  Dr. Angell's credentials are not contained
in the record, and Zurich could not even identify Dr. Angell.
The unauthenticated report by Dr. Angell must be given no
weight.

I now turn to the two explanations given by Zurich.  I find
the first explanation that the cause of death was heart disease
unreasonable.  First, this explanation is refuted by one medical
examiner relied on by Zurich, Dr. Taff.  Dr. Taff specifically
stated that "the immediate cause of [Mr. Arruda's] death was a
combination of multiple blunt force impact bodily injuries and
positional asphyxia."  Second, both Dr. Bell and the autopsy
report cite no evidence to support the conclusion that heart
disease was the cause of death, other than the fact that Mr.
Arruda had a history of heart disease prior to his death.
Third, Dr. Laposata directly addressed Zurich's argument:

> It is also clear that Mr. Arura [sic] did not die from
> hypertensive heart disease or experience a so-called
> natural death at the wheel with a resulting collision.
> First, interrogation of the internal cardiac
> defibrillator did not show any abnormal heart rhythms
> prior to the accident.  Further, the autopsy showed no
> acute natural event incompatible with life.  He did
> have an enlarged heart consistent with his known
> medical history.  There was no evidence of acute
> infarction (heart attack).  Further evidence that Mr.
> Arruda was alive at the time of the crash is the

occurrence of extensive bleeding documented around his
numerous injuries. When a natural death at the wheel
precedes the crash, the heart is not pumping blood at
the time the body is damaged by the accident and,
therefore, the damage to the body shows no evidence of
bleeding; again, not consistent with the findings in
Mr. Arruda's case.

Dr. Laposata's statement fully supports the contention that
heart disease was not the cause of death.[4] Zurich does not
engage with the opinion of Dr. Laposata.

I also find Zurich's second explanation that Mr. Arruda's
pre-existing illness caused the accident unreasonable. Zurich
relies on Dr. Taff's report in which Dr. Taff concluded Mr.
Arruda's "pre-existing health conditions most likely triggered
[Mr. Arruda's] loss of control/erratic driving." But Dr. Taff
undermined his conclusion by stating that "[t]here is no way to
scientifically prove which human factor(s)/pre-existing medical

---

[4] I note that Mrs. Arruda relies heavily on the arrhythmia
logbook report. She contends that the logbook report indicates
that Mr. Arruda's internal defibrillator showed no abnormal
heart rhythms prior to the collision. A closer reading of the
logbook report shows that the last successful completion of
"rhythm ID update" was on May 22, 2014, the day of the crash, at
8:23—more than an hour prior to the crash. [R. at 1147.]
Neither party explains what this means, but it would appear that
the device may not have updated from that time forward. In
short, the arrhythmia logbook can at best only show that Mr.
Arruda did not suffer a cardiac event one hour before the crash.
Thus, the logbook does not bear all the weight Mrs. Arruda seeks
to place on it. It does, however, further underscore the
proposition that Zurich's contention the cause of death was
heart disease is not supported by substantial evidence, but is
rather speculative.

condition(s) occurred during the pre-collision phase of the accident that resulted in fatal bodily injuries." Dr. Taff's causation opinion is both speculative and conclusory. Because Zurich does not provide evidence beyond the mere existence of pre-existing illness, its conclusion is not supported by substantial evidence.

Even under the deferential arbitrary and capricious standard, I conclude Zurich's determination was unreasonable. It makes a speculative leap from the proposition that because Mr. Arruda suffered from heart disease over the course of years, the blunt trauma accident which killed him was caused by that pre-existing condition. This is nothing other than an example of the familiar logical fallacy *post hoc ergo propter hoc*. I conclude Zurich's conclusion of causation by the pre-existing condition is unreasonably arbitrary and capricious.

**B.** **_Under the Influence of Marijuana: Independent of All Other Causes and Exclusion 8_**

Zurich next contends that its decision to uphold the denial of benefits on the additional ground that Mr. Arruda was under the influence of marijuana at the time of the car accident is supported by substantial record evidence. Under Exclusion 8 of the Policy, coverage is precluded if the loss is caused by, contributed to, or results from being under the influence of

narcotics.  Here, again, the evidence of causation is conclusory and speculative.

The autopsy report and the Postmortem Toxicology Report indicate there was marijuana in Mr. Arruda's blood.  [R. at 834, 842.]  During the appeals process, Zurich asked Dr. Taff to comment on the presence of "cannabinoid" in Mr. Arruda's system on the morning of the car accident.  Specifically, Zurich asked the following question [presented in boldface] and received the following precise response:

> **Please comment on the presence of cannabinoid at the time of death.  Would the use of cannabinoid have any potential negative effect on the decedent with the mix of medications that he was on and with the medical conditions that pre-existed the accident?  Can you comment on what his use of marijuana may have had in an impairment level which could have been a contributing factor in the accident?**
>
> The presence of marijuana in JA's blood alone would have impaired his ability to operate his motor vehicle by causing mental confusion, changes in pulse, respiratory rate and blood pressure, heart palpitations, agitation and possibly hallucinations. Since marijuana has an effect on the cardiovascular system, the mixing of marijuana with other prescribed cardiac medications could have adversely affected both JA's cardiovascular system and blood pressure and his ability to operate a motor vehicle.  Although ha specific quantitative level of the active ingredient of marijuana (Delta-9THC (17 ng/mL) [sic] was reported in this case, marijuana is a central nervous system depressant/hallucinogen that causes different behavioral and physiological changed in each person. Responses to marijuana vary from one person to another

and precise and predictable behavioral and
physiological reactions to the drug cannot be
rendered.

[*Id.* at 1532].

Dr. Taff's initial conclusion, that the marijuana alone
"would have impaired [Mr. Arruda's] ability to operate his motor
vehicle," is eviscerated by his acknowledgement that "precise
and predictable behavioral and psychological reactions to the
drug cannot be rendered."  There is no evidence in the record
regarding how the marijuana in Mr. Arruda's system may or may
not have impaired his driving and caused the car accident.
Zurich's determination based on Dr. Taff's report is speculative
and, as such, unreasonably arbitrary and capricious.

The different spin given in Dr. Laposata's report
underscores the speculative character of Dr. Taff's conclusion
about marijuana impairment causation.  She notes that
"[g]enerally, more complex multitasks are more sensitive to
marijuana impairment, and tasks that are well practiced such as
driving tend to be more resistant to drug effects."  [R. at
1700.]  This is not, as Mrs. Arruda contends, a lack of evidence
that Mr. Arruda was under the influence of marijuana.  Dr.
Laposata's conclusion, however, emphasizes that Dr. Taff's
cautionary observation that the levels of marijuana metabolites
reported "do not correlate with precise and predictable
behavioral and physiological changes," [R. at 1531], is

essentially a conclusion that Dr. Taff cannot determine whether or not marijuana impaired Mr. Arruda's driving and thus a determination that Dr. Taff cannot meaningfully opine that Exclusion 8 applies.

## IV. CONCLUSION

For the reasons outlined above, I GRANT the plaintiff's Motion for Summary Judgment [39], and I DENY the defendant's Motion for Summary Judgment/Motion for Judgment on the Administrative Record [37]. The Clerk shall enter judgment for the plaintiff declaring that the defendant must pay Mrs. Arruda's Accident Death & Disability benefit with interest and that Mrs. Arruda is entitled to award of statutory attorneys' fees and costs as provided by ERISA, 29 U.S.C. § 1132(g).


*/s/ Douglas P. Woodlock*_____
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE